No. 17-1188

# United States Court of Appeals for the Federal Circuit

FLEXUSPINE, INC.

*Plaintiff-Cross-Appellant*

v.

GLOBUS MEDICAL, INC.

*Defendant-Appellant*

Appeal from United States District Court for the Eastern District of Texas
Case No.: 6:15-CV-00201, Judge Rodney Gilstrap

**PLAINTIFF-CROSS-APPELLANT'S CORRECTED OPENING BRIEF**


Mark D. Strachan
mstrachan@swtriallaw.com
Darren P. Nicholson
dnicholson@swtriallaw.com
E. Sawyer Neely
sneely@swtriallaw.com
SAYLES | WERBNER
4400 Renaissance Tower
1201 Elm St.
Dallas, Texas 75270
(214) 939-8722
(214) 939-8787 fax

Jonathan T. Suder
jts@fsclaw.com
Brett M. Pinkus
bpinkus@fsclaw.com
Todd I. Blumenfeld
blumenfeld@fsclaw.com
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, Texas 76102
(817) 334-0400
(817) 334-0401 fax

*Counsel for Plaintiff/Cross-Appellant Flexuspine, Inc.*

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Cross-Appellant Flexuspine, Inc. certifies the following:

1. The full name of every party or amicus represented by me is Flexuspine, Inc.

2. The name of the real party in interest represented by me is Flexuspine Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: No publicly held company owns 10 percent or more of the stock of Flexuspine, Inc.

4. The names of all law firms and partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are: Mark D. Strachan, Darren P. Nicholson, and E. Sawyer Neely of SAYLES| WERBNER, along with Jonathan T. Suder, Brett M. Pinkus and Todd I. Blumenfeld of FRIEDMAN, SUDER & COOKE.

March 22, 2017

/s/ Mark D. Strachan
Attorney for Plaintiff-Cross-Appellant
Flexuspine, Inc.

## CONFIDENTIALITY STATEMENT

Certain aspects of this appeal involve reliance and admissibility of a license agreement between Globus and third parties. The terms of the license agreement are confidential. Globus produced the license agreement under seal in the District Court subject to a protective order. This brief refers to the license agreement but does not disclose confidential information.

# TABLE OF CONTENTS

Certificate of Interest ........ ii

Confidentiality Statement ........ iii

Table of Contents ........ iv

Table of Authorities ........ vii

Statement of Related Cases ........ xii

Statement of the Issues ........ 1

Statement of the Case ........ 2

Summary of the Argument ........ 4

Argument ........ 7

I. Standard of Review ........ 7

A. Jury Verdict ........ 7

B. Motion for Judgment of Invalidity as a Matter of Law ........ 7

C. Summary Judgment Generally ........ 8

D. Summary Judgment of Noninfringement ........ 9

E. Exclusion of Relevant Royalty Rates ........ 9

II. Jury Instructions on Invalidity ........ 11

A. The District Court was correct in holding that Globus acquiesced in submitting the issue of invalidity to the jury conditioned on a finding on infringement ........ 11

B. The District Court was correct in holding that Globus's acquiescence to submitting an invalidity special verdict that is conditionally based upon a finding of infringement rendered moot Globus's motion for judgment of invalidity as a matter of law ........ 15

III. The District Court Did Not Abuse its Discretion in Denying Globus's Motion for Judgment of Invalidity as a Matter of Law ....16

A. Legal Standard for Judgment as a Matter of Law ....16

B. Claim 1 of the '853 Patent is Not Anticipated nor Rendered Obvious as a Matter of Law ....19

1. Claim 1 is Not Anticipated by U.S. Patent No. 5,782,832 (Larsen) ....19

2. Claim 1 is Not Anticipated by U.S. Patent No. 6,443,989 (Jackson) ....22

3. Claim 1 is Not Rendered Obvious by U.S. Patent 5,522,899 (Michelson) ....23

C. Claims 1 and 2 of the '714 Patent are Not Anticipated nor Rendered Obvious ....24

1. Claims 1 and 2 of the '714 Patent are Not Anticipated nor Rendered Obvious by U.S. Patent 6,176,882 (Biedermann) ....24

2. Claims 1 and 2 of the '714 Patent are Not Anticipated by Larsen ....28

IV. The District Court's Summary Judgment of Non-Infringement of Claim 17 of the '810 Patent Should be Reserved Because It Defies Fundamental Mathematical and Scientific Principles ....29

A. The Agreed Construction of Oblique Movement ....30

B. Oblique Movement within the Specification of the '810 Patent ....33

C. The District Court's Rationale in Declining to Credit Flexuspine's Expert Testimony Regarding Relative Motion Defies the Laws of Physics and Mathematics ....36

D. Oblique Movement within the Accused Products ....39

V. The Court Erred In Excluding References to the Synthes Litigation ....46

A. Legal Standard ....46

B. Synthes Litigation ....47

C. Globus Statements to FDA Establish Comparability ....49

D. The Synthes Verdict Is a Comparable Royalty Rate ....52

E. Becker's Analysis of the Synthes Royalty Rate ....................................................53

Conclusion ....................................................................................................................53

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Am. Home Assurance Co. v. United Space Alliance,*
378 F.3d 482 (5th Cir. 2004)....................................................................16

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..........................................................................8, 9

*Bai v. L & L Wings,*
160 F.3d 1350 (Fed. Cir. 1998)....................................................................9

*Bellows v. Amoco Oil Co.*,
118 F.3d 268 (5th Cir.1997).........................................................................8

*Cambridge Toxicology Group, Inc. v. Exnicios,*
495 F.3d 169, 179 (5th Cir.2007)..................................................................8

*Cytologix Corp. v. Ventana Med. Sys.,*
2006 U.S. Dist. LEXIS 40973 (D. Mass. June 20, 2006) ..............................36

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ............................9, 10

*DDR Holdings, LLC v. Hotels.com, L.P.*,
954 F. Supp. 2d 509 (E.D. Tex. 2013) ..........................................................17

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)....................................................................17

*Diversitech Corp. v. Century Steps, Inc.*,
850 F.2d 675 (Fed. Cir. 1988)......................................................................18

*Ericsson v. D-Link Systems, Inc.*,
773 F.3d at 1227 (Fed. Cir. 2014)................................................................46

*Finisar Corp. v. DirecTV Grp., Inc.*,
523 F.3d 1323 (Fed. Cir. 2008)......................................................8, 16, 18

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) .........................................................46, 47

*Finnigan Corp. v. Int'l Trade Comm'n*,
180 F.3d 1354, (Fed. Cir. 1999) .........................................................17

*Gemmy Indus. Corp. v. Chrisha Creations Ltd.*,
452 F.3d 1353 (Fed. Cir. 2006) .........................................................9, 30

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ..........................................19

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) .........................................................46

*Harris Corp. v. Ericsonn, Inc.*,
417 F.3d 1241 (Fed. Cir. 1005) .........................................................8

*Highmark, Inc. v. Allcare Health Management System, Inc.*,
___ U.S. ____, 134 S. Ct. 1744 (2014) ..................................................7

*Hiltgen v. Sumrall,*
47 F.3d 695, 699 (5th Cir.1995) .........................................................16

*Hitachi Consumer Elecs. Co. v. Top Victory Elecs. (Taiwan) Co.,*
No. 2:10-CV-260-JRG, 2013 WL 5273326 (E.D. Tex. Sept. 18, 2013) .............17

*Hitachi Consumer Elecs. Co. v. Top Victory Elecs. (Taiwan) Co.,*
577 Fed. Appx. 998 (Fed. Cir. 2014) ....................................................17

*i4i Ltd. v. Microsoft Corp.,*
598 F.3d 831 (Fed. Cir. 2010) .........................................................10, 48

*Int'l Ins. Co. v. RSR Corp.,*
426 F.3d 281 (5th Cir. 2005) ...........................................................17

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) .........................................................19

*Konami Corp. v. Roxor Games, Inc. et al.*,
445 F. Supp. 3d 725 (E.D. Tex. 2006) ....................................................36

*Knight v. Kirby Inland Marine Inc.,*
482 F.3d 347 (5th Cir. 2007)....................................................................10

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ...........................................................46, 47

*Liquid Dynamics Corp. v. Vaughan Co.*,
355 F.3d 1361 (Fed. Cir. 2004) .......................................................15, 16

*Lucent Technologies, Inc. v. Gateway, Inc.,*
580 F.3d 1301 (Fed. Cir. 2009) ...............................................................47

*McDaniel v. Anheuser-Busch, Inc.*,
987 F.2d 298 (5th Cir. 1993) ....................................................................12

*Micron Technology, Inc. v. Mosaid Technologies, Inc.*,
518 F. 3d 897 (Fed. Cir. 2008) ...................................................................7

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011) .............................................................................17

*Moore v. Ashland Chem. Inc.,*
151 F.3d 269 (5th Cir. 1998)....................................................................10

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ...............................................................18

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
469 F.3d 978 (Fed. Cir. 2006) ....................................................................8

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed.Cir.2007)...................................................................19

*Phonometrics, Inc. v. N. Telecom Inc.*,
133 F.3d 1459 (Fed. Cir. 1998) ...............................................................16

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999) .......... 9

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
No. 2016-1456, 2017 WL 877221 .......... 46

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed.Cir.2009) .......... 19

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) .......... 17

R*esQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed.Cir.2010) .......... 46, 47

*Richard v. Firestone Tire & Rubber Co.*,
853 F.2d 1258 (5th Cir. 1988) .......... 7

*Silicon Graphics, Inc. v. ATI Technologies, Inc.*,
2011 WL 322664 (W.D. Wis. 2011) .......... 13, 15

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
862 F.2d 1564 (Fed. Cir. 1988) .......... 46

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015) .......... 46

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015) .......... 9

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
295 F.3d 1292 (Fed. Cir. 2002) .......... 18

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .......... 46

*Unisplay, S.A. v. American Electronic Sign Co., Inc.*,
69 F.3d 512 (Fed. Cir. 1995) .......... 47

*United States v. Reed*,
147 F.3d 1178 (9th Cir. 1998) .......... 12

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) .......... 47, 48

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
609 F.3d 1308 (Fed. Cir. 2010) .......... 46

**STATUES**

35 U.S.C. § 102 .......... 18

35 U.S.C. § 103(a) .......... 18

35 U.S.C. § 282 .......... 17

**RULES**

Fed. R. Civ. P. 50(a) .......... 16

Fed.R.Civ.P. 50(a)(1) .......... 8

Fed. R. Civ. P. 51 .......... 12

Fed.R.Civ.P. 56(c) .......... 8

F.R.E. 702 .......... 9

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff/Cross-Appellant Flexuspine, Inc. states that no other appeal in these civil actions was previously before this Court or any other appellate court.

## Statement of the Issues

### Flexuspine's Restatement of the Issues on Globus's Appeal:

1. Whether the District Court was correct in holding that Globus acquiesced in submitting the issue of invalidity to the jury conditioned only on a finding of infringement.

2. Whether the District Court was correct in holding that the jury's determination of non-infringement rendered Globus's invalidity affirmative defense moot.

3. Whether the District Court was correct in holding that Globus's acquiescence to submitting an invalidity special verdict that was conditionally based upon a finding of infringement rendered Globus's motion for judgment of invalidity as a matter of law moot.

### Flexuspine's Statement of the Issues on Cross-Appeal:

1. Whether the District Court erred in granting summary judgment of noninfringement of the '810 patent.

**2.** Whether the District Court erred in excluding a damages expert's reference to a reasonable royalty rate determined by a jury in litigation between Globus and a third-party involving comparable technology under comparable circumstances near the time of the hypothetical negotiation in the instant case.

## <u>STATEMENT OF THE CASE</u>

Flexuspine, Inc. ("Flexuspine") develops expandable spinal implants for use in spinal fusions and spinal disc replacement. Flexuspine owns a patent portfolio protecting the medical devices it develops. Globus Medical, Inc. ("Globus") manufacturers and sells expandable spinal implants for use in spinal fusions, including its Caliber, Caliber L, and Altera implants. Flexuspine sued Globus for infringement of United States Patent No. 7,204,853 ("the '853 patent"), United States Patent No. 7,316,714 ("the '714 patent"), and United States Patent No. 8,123,810 ("the '810 patent"). Globus denied infringement and asserted that the patents were invalid. Globus also filed a counterclaim asserting invalidity but abandoned its invalidity counterclaim prior to submission of the case to the jury.

All three patents describe devices to be placed between adjacent spinal vertebras. They each call for an upper and lower body, which contact the respective vertebral surfaces. Positioned between the upper and lower body are inserts, expansion members, and/or elongated bodies, which operate to expand the space between the upper and lower bodies. Claim 17 of the '810 patent claims an elongated body positioned between an upper body and the lower body which moves obliquely to at least a portion of the upper and lower bodies. The elongated body of the Caliber and Caliber L moves obliquely to the upper and lower bodies. However, the District

Court granted summary judgment of noninfringement, either misunderstanding the concept of relative motion or using the wrong frame of reference to determine it.

The case proceeded to trial on the ‘853 and ‘714 patents. To support its request for a reasonable royalty, Flexuspine referenced a jury verdict, judgment, and subsequent license agreement in a case brought by Depuy-Synthes asserting that Globus’s spinal fusion implant devices infringed Synthes’s patents. Despite the fact that the products accused by Synthes were the predicate products for the Caliber, that Globus declared that the Synthes case is the benchmark for analysis of spinal fusion device royalty rates, and that Flexuspine’s expert adjusted the royalty rate for technical and economic differences between the Synthes and Flexuspine cases, the District Court excluded the Synthes verdict, judgment, and license agreement.

At the close of the evidence, the District Court reviewed proposed jury instructions and verdict form with the parties. The Court’s proposed submitting invalidity conditioned upon an affirmative finding of infringement, i.e., as an affirmative defense but not as a counterclaim. The Court’ proposed instruction was typed in all capitals and placed immediately above the jury question on invalidity. Globus said that it had no objection, and the District Court proceeded to instruct and query the jury on the affirmative defense of invalidity. The jury returned a verdict of noninfringement of the ‘853 and ‘714 patent. Post-verdict, Globus admitted that it

had failed to timely object to the submission of conditioned on a finding of infringement.

Globus subsequently filed a motion for judgment of invalidity blaming Flexuspine and the District Court for Globus's failure to object. Globus also filed a post-trial motion for judgment of invalidity asserting that the '853 and '714 patents are anticipated and/or rendered obvious as a matter of law. The District Court denied both motions and entered judgment of noninfringement.

Flexuspine does not appeal the judgment of noninfringement of the '853 and '714 patent. Flexuspine appeals the summary judgment of noninfringement of the '810 patent as well as the exclusion of the Synthes verdict, judgment, and subsequent license agreement.

## SUMMARY OF THE ARGUMENT

"I do want to lodge a formal objection over the verdict. I understand that we did not make that at the appropriate time, but we do object for the record." Appx5020; Globus Br. 11. That admission by Globus is the beginning and the end of Globus's appeal. If asked about this admission by this Court, Globus's answer should be "I understand that we did not object the four times we were asked by the District Court for objections, but we did not mean to waive our objection."

Globus accuses Flexuspine and the District Court of not explaining that the jury might not need to reach the question of invalidity. Globus Br. 9. However,

Globus's accusation follows immediately after Globus's faithful reproduction of the jury instruction, in capital letters, at the top of the page of the invalidity jury question:

> ANSWER THIS QUESTION ONLY AS TO THOSE CLAIMS YOU ANSWERED "YES" IN QUESTION ONE ABOVE — OTHERWISE DO NOT ANSWER THIS QUESTION.

*Id.*. The jury answered "no" to all of the claims in Question 1.

Globus asserts that the jury was obligated to ignore this jury instruction because it conflicted with the jury instruction "Your job in this case is to decide whether the asserted claims have been infringed and whether the asserted claims of the patents-in-suit are invalid." As noted by the District Court, there is no conflict between the two instructions. Detailed instructions explaining the separate elements and burdens of proof of infringement and invalidity do not conflict with an instruction that the jury should answer the invalidity question only if they have found infringement. Globus's attempt to create a "conflict" is only an effort to rescue itself from its admitted waiver of objection to submission of invalidity with a "stop" instruction.

Globus also asserts that the '853 and '714 patents are anticipated and/or rendered obvious as a matter of law. In other words, Globus maintains that no reasonable jury could find that the patents-in-suit were not anticipated and/or not rendered obvious. Whether Globus abandoned its invalidity counterclaim or agreed to submit its counterclaim with a "stop" instruction, it should not now be heard to

assert a post-trial motion for judgment of invalidity as a matter of law. Futhermore, as set out in detail below, the asserted claims, prior art reference, testimony by Flexupine's expert, and cross examination of Globus's expert provided ample basis for a jury to conclude that Globus failed to prove by clear and convincing evidence that the Flexuspine patents were either anticipated or rendered obvious.

The District Court erred in granting summary judgment of noninfringement of the '810 patent based on a misunderstanding of oblique movement. All movement is relative to a reference frame. The asserted claim of the '810 patent explicitly makes the surface of upper and lower bodies of the implant the reference frame for movement of the elongated body. Simple geometry demonstrates that if one selects one point on the elongated body, and a second point on the surface of the upper or lower body, the two points move obliquely relative to each other as the implant is expanded. One can reach a contrary conclusion only if one chooses a different reference contrary to the express reference frame of the claim.

Finally, in determining a reasonable royalty rate for patent infringement, parties, judges, and juries are rarely favored with actual negotiation that reflects exactly the hypothetical negotiation. Consequently, they must search for other events that bear light on the hypothetical negotiation. In this case, Flexuspine proffered a jury verdict, judgment, and subsequent license agreement from litigation asserted by Depuy-Synthes against Globus' spinal fusion products. The products accused by

Synthes were the predicate to the Globus products accused by Flexuspine. Despite statements by Globus to the FDA, a statement by Globus that the litigation was the benchmark for spinal fusion implant royalty rates, and consideration and explanation of the minor technical and economic differences, the District Court, erroneously, excluded reference to the Synthes litigation.

## ARGUMENT

### I. Standard of Review

#### A. Jury Verdict

Review of a district court's decision that the jury must follow the court's instructions is governed by regional law, in this case the Fifth Circuit. The standard of review for Globus's issue is whether the District Court abused its discretion in refusing to consider a jury question answered in violation of the District Court's instructions. *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1260 (5th Cir. 1988).

#### B. Motion for Judgment of Invalidity as a Matter of Law

The District Court exercised its discretion in determining that the issue of invalidity was moot. The standard of review is abuse of discretion. *Highmark, Inc. v. Allcare Health Management System, Inc.*, ___ U.S. ____, 134 S. Ct. 1744 (2014); *Micron Technology, Inc. v. Mosaid Technologies, Inc.*, 518 F. 3d 897 (Fed. Cir. 2008).

If this Court reaches the merits of a motion for judgment as a matter of law, this Court applies the law of the regional circuit. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008). The Fifth Circuit reviews judgment as matter of law without deference. *Cambridge Toxicology Group, Inc. v. Exnicios,* 495 F.3d 169, 179 (5th Cir.2007). A judgment as a matter of law "is appropriate only when a 'reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Id.* (quoting Fed.R.Civ.P. 50(a)(1)). "The Fifth Circuit describes appellate review of a JMOL denial as a determination whether 'the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict.'" *Harris Corp. v. Ericsonn, Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005) (quoting *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir.1997)).

**C. Summary Judgment Generally**

This Court reviews a grant of summary judgment *de novo*. *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 984 (Fed. Cir. 2006). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]he fundamental premise of a grant of summary

judgment is that no reasonable jury could find other than in favor of the movant, when all reasonable factual inferences are drawn in favor of the non-movant." *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1359 (Fed. Cir. 2006). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48.

**D. Summary Judgment of Noninfringement**

The review of summary judgment of non-infringement requires two steps. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999). First, claim construction, in which the determination of the meaning and scope of the patent claims is a mixed question of law and fact, is reviewed *de novo* without deference to the trial court unless there are underlying factual disputes, which would then require review under the "clearly erroneous" standard. *Teva Pharm. USA, Inc. v. Sandoz, Inc.,* 135 S. Ct. 831, 838 (2015). Second, infringement, in which the comparison of properly construed claims to the device accused of infringing is a question of fact, and is reviewed to determine whether there was no genuine issue of material fact. *Bai v. L & L Wings,* 160 F.3d 1350, 1353 (Fed. Cir. 1998).

**E. Exclusion of Relevant Royalty Rates**

To determine whether expert testimony should be admitted under Rule 702 of the Federal Rules of Evidence, courts utilize the framework set out in *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* requires that scientific testimony "is not only relevant, but reliable." *Id.* at 589. However, once that minimum standard of reliability is met, the Supreme Court explained that "[v]igorous cross-examination" and the "presentation of contrary evidence" are "the traditional and appropriate means" of addressing perceived shortcomings in an opposing expert's methods. 509 U.S. at 596. The Federal Circuit and the Fifth Circuit have applied the same approach. In *i4i Ltd. v. Microsoft Corp.,* the Federal Circuit clarified that "when the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." 598 F.3d 831, 852 (Fed. Cir. 2010) (emphasis added), *aff'd* 564 U.S. 91, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011). See also *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 351 (5th Cir. 2007); *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

## II. Jury Instruction on Invalidity

### A. The District Court was correct in holding that Globus acquiesced in submitting the issue of invalidity to the jury conditioned on a finding on infringement

In its verdict form, the District Court submitted infringement as Question 1. The Court then submitted the following jury instruction and question:

> ANSWER THIS QUESTION ONLY AS TO THOSE CLAIMS YOU ANSWERED "YES" IN QUESTION ONE ABOVE — OTHERWISE DO NOT ANSWER THIS QUESTION.
>
> QUESTION TWO:
>
> Did Globus prove by clear and convincing evidence that any of the asserted claims of the following patents are invalid?

Appx24.

The jury answered "No" to all parts of Question 1 (infringement). (Appx23). Accordingly, the jury was instructed to not answer Question 2 or any other question. Contrary to the Court's instructions, the jury answered "Yes" to all parts of Question 2.

Globus is not complaining that the judge improperly instructed the jury. In fact, Globus stated that it had no objections to the instructions of Question 2. Further, Globus is not complaining that the jury failed to follow the District Court's instructions, nor does it dispute that the jury failed to follow the Court's instructions. Globus's complaint is that the Court should have entered a judgment embracing the fact that that jury ignored the Court's clear "stop" instruction.

"Verdict forms are, in essence, instructions to the jury." *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998). A party is required to make its objections to the jury instructions before the instructions are delivered to the jury. Fed. R. Civ. P. 51. "[F]ailure to object to the wording of a special issue prevents a party from objecting to such wording on appeal." *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 306 (5th Cir. 1993).

On August 18, 2016, the Court conducted a charge conference in chambers in which the Court and counsel discussed all questions, comments, and objections by either party to the other's proposed jury instructions and verdict form. Appx4895. Following the charge conference, the Court delivered its proposed jury instructions and verdict form to the parties. *Id*. The Court's proposed verdict form instructed the jury not to answer Question 2 unless they answered "Yes" to Question 1. After affording the parties an opportunity to review its proposed charge, the Court then stated: "I'm now prepared to start a formal charge conference where we'll take each document on a page-by-page basis and address any objections either party wishes to make for the Court's consideration and the preservation of their records." Appx4896. The Court further stated, "As we get to any page where you believe there's a matter that should have been included that wasn't or has been included and shouldn't have been, please feel free to register what you believe to be an appropriate objection for the Court to consider and for the record." Appx4896-4897. After taking objections

to the Court's jury instructions, the Court heard objections to the verdict form using the same page-by-page review procedure. Appx4911.

As to Question 2, the Court asked, "Turning to Page 3 wherein the Court has set forth Question 2, is there any objection from either party?" Appx2912. After Plaintiff did not raise any objection, the Court stated "All right. Defendant?" Defendant answered "**Nothing from the Defendant, Your Honor**." *Id.* (emphasis added). Before closing the charge conference, the Court asked again "Anything further from the Defendant with regard to the verdict form?" Defendant answered, "**No, Your Honor**." Appx4917. (emphasis added).

Before charging the jury the next morning on September 19, 2016, the Court asked again "Is there anywhere — is anyone aware of anything further before we bring in the jury?" After Flexuspine replied "Nothing from Plaintiff, Your Honor," Globus answered, "**Nor from the Defendant, Your Honor**." Appx4925.

Invalidity is both an affirmative defense and a counter-claim. A finding of no infringement moots invalidity as an affirmative defense. *Silicon Graphics, Inc. v. ATI Technologies, Inc.*, 2011 WL 322664, *3–*4 (W.D. Wis. 2011). Hence, invalidity as an affirmative defense is submitted conditioned on an affirmative finding of infringement. In every conference with the Court, Globus agreed to the submission of invalidity conditioned upon an affirmative finding of infringement. In other words, Globus agreed to submit to the jury its affirmative defense of invalidity,

but chose not to submit invalidity as a counterclaim. There are advantages and disadvantages to such a strategy. Even if Globus intended to submit invalidity as a counterclaim, it acquiesced in submitting its counterclaim with a "stop" instruction.

On the afternoon of September 19, 2016, the jury reported they had reached a verdict. Upon reviewing the verdict form, the Court determined that the jury had not followed the Court's instructions. Appx5011-5014. After answering "No" to all parts of Question 1, the jury should have stopped. Instead, the jury had proceeded to address every question in the verdict form, including questions 2 and 3. *Id*. The Court then instructed the jury to retire, review the verdict form again, and return a verdict consistent with the Court's instructions. Appx5011-5014, Appx5021. Only after Globus saw all of the cards, i.e. the jury's first attempt to render a verdict, did Globus change its position and object to not submitting invalidity as a counter-claim. Appx11. The jury resumed its deliberations and returned a verdict in accordance with the Court's instruction. Appx22-26. After the jury was released, Globus stated "I do want to lodge a formal objection over the verdict. I understand that we did not make that at the appropriate time, but we do object for the record." Appx5020; Globus Br. 11.

### B. The District Court was correct in holding that Globus's acquiescence to submitting an invalidity special verdict that is conditionally based upon a finding of infringement rendered moot Globus's motion for judgment of invalidity as a matter of law.

In addition to its Motion to Amend Verdict, Globus submitted a post-trial Motion for Judgment as a Matter of Law arguing that the asserted claims of the '853 and '714 Patents were invalid as a matter of law. However, as discussed above, Globus agreed that the submission of invalidity be conditioned upon an affirmative finding of infringement. In other words, Globus agreed to submit to the jury its affirmative defense of invalidity, but chose not to submit invalidity as a counterclaim. Or, Globus agreed to submit its invalidity counterclaim conditioned on a finding of infringement. Either way, the jury's finding of no infringement rendered the affirmative defense of invalidity moot. *Silicon Graphics, Inc. v. ATI Technologies, Inc.,* 2011 WL 322664, *3–*4 (W.D. Wis. 2011). There was no affirmative defense or counterclaim issue of invalidity remaining on which the Court could enter a judgment of invalidity as a matter of law.[1]

As to a counterclaim of invalidity, "the District Court may exercise its discretion to dismiss a counterclaim alleging that a patent is invalid as moot. *See Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1371 (Fed. Cir. 2004);

[1] Flexuspine disagrees with the District Court's conclusion that Globus's invalidity counterclaim remained a live issue after the jury verdict. Appx11. Flexuspine agrees that "the jury verdict of non-infringement resolved the controversy between the parties" and rendered invalidity moot for all purposes. *Id.*

*Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998). The Court did not abuse its discretion in dismissing the counterclaims as moot given Globus acquiescence in the submission of invalidity solely as an affirmative defense.

## III. The District Court Did Not Abuse its Discretion in Denying Globus's Motion for Judgment of Invalidity as a Matter of Law

### A. Legal Standard for Judgment as a Matter of Law

Furthermore, the District Court did not abuse its discretion when one considers the merits of Globus's motion for judgment of invalidity as a matter of law. Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the District Court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed.Cir.2008). The Fifth Circuit "uses the same standard to review the verdict that the District Court used in first passing on the motion." *Hiltgen v. Sumrall,* 47 F.3d 695, 699 (5th Cir.1995). Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall,* 47 F.3d at 700. The jury verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance,* 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The moving party is entitled to judgment as a matter of law "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005). *See Hitachi Consumer Elecs. Co. v. Top Victory Elecs. (Taiwan) Co.*, No. 2:10-CV-260-JRG, 2013 WL 5273326, at *1–2 (E.D. Tex. Sept. 18, 2013), *aff'd sub nom. Hitachi Consumer Elecs. Co. v. Top Victory Elecs. (Taiwan) Co.*, 577 Fed. Appx. 998 (Fed. Cir. 2014); *DDR Holdings, LLC v. Hotels.com, L.P.*, 954 F. Supp. 2d 509, 515 (E.D. Tex. 2013), *aff'd in part, rev'd in part and remanded,* 773 F.3d 1245 (Fed. Cir. 2014).

As a patent is presumed valid, the burden of establishing invalidity of any of a patent's claims is borne by the party challenging validity. 35 U.S.C. § 282. The party challenging the patent bears the burden of overcoming the presumption of validity by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

Anticipation is a question of fact. *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1362 (Fed. Cir. 1999). To anticipate the patent, a single prior art reference

must contain or describe every element of the claimed invention, either expressly or inherently. *Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323, 1334-35 (Fed. Cir. 2008). Although the prior art reference need not use the same language as a patent claim, Federal Circuit decisions require 'strict identity' between the prior art reference and the claimed invention. *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002); *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 677 (Fed. Cir. 1988) (anticipation requires that "every element of the claimed invention must be identically shown in a single reference"). "Because the hallmark of anticipation is prior invention, the prior art reference — in order to anticipate under 35 U.S.C. § 102 — must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'" *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).

"A patent is obvious, and, therefore, invalid 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" 35 U.S.C. § 103(a). Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of

nonobviousness[2].” *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) (referring to *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684). Globus was required to show ‘by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.’” *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed.Cir.2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed.Cir.2007)).

### B. Claim 1 of the ‘853 Patent is Not Anticipated nor Rendered Obvious as a Matter of Law

#### 1. Claim 1 is Not Anticipated by U.S. Patent No. 5,782,832 (Larsen)

Globus asserts that U.S. Patent 5,782,832 (“Larsen”) anticipates claim 1 of the ‘853 Patent as a matter of law. Larsen does not anticipate claim 1 because it fails to teach or suggest each feature required by the claim. Larsen fails to teach or suggest the limitation “wherein a portion of the superior surface of the lower body is configured to inhibit backout of the expansion member from the intervertebral implant,” as recited in claim 1 of the ‘853 Patent.

[2] Commonly referred to as the *Graham* factors after *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

The embodiment of Larsen relied upon by Globus discloses a cam-type spinal implant that includes upper and lower support members (402, 404) which are expanded by use of a camming block (412). Appx5055-5057; Appx5063, col. 8, ll. 16-19. The upper surface of the camming block (414) is an inclined camming surface which engages with a corresponding inclined inner surface (416) of the upper support member (402). Appx5063, col. 8, ll. 21-24. The upper and lower support members (402, 404) are connected through a pin and slot arrangement (424, 432). Appx5063, col. 8, ll. 30-37. A screw (418) engages an internal bore (422) of the camming block (412) to advance the camming block (412) so as to lift the upper support member (402) relative to the lower support member (404). Appx5063, col. 8, ll. 38-47. Figs. 22 and 24 of Larsen are reproduced below.




Appx5056-5057.

Globus identifies the camming block (412) as the "insert" and the screw (418) as the "expansion member." Globus Brief at 36. Globus explains that as the screw

is threaded into the corresponding threaded bore (422), the camming block causes the upper and lower bodies to move apart. Globus Brief at 37. Globus then suggests that the threaded bore inhibits backout of the screw. Globus Brief at 37.

The threaded bore of Larsen is not a portion of the superior surface of the lower body. Appx4797. Dr. Oxland explained, the threads of the set screw within the Larsen threaded bore is not what is contemplated by the '853 Patent as the ***portion of the upper surface of the lower body*** that is configured to inhibit backout of the expansion member. Appx4797-4798.

The specification of the '853 Patent discloses various embodiments which include a screw that is employed as an expansion member to cause the insert to move and to be elevated. Appx56-58, Figs. 2, 3b. 4a-4b; Appx62, Figs. 7a-7b; Appx75, col. 5, ll. 21-25; Appx76-78, col. 8, ll. 37-42; col. 9, ll. 5-8; col. 10, ll. 2-6; col. 10, ln. 66 – col. 11, ln. 6. While such a screw will have threads that allow it to be advanced and retracted within a corresponding threaded bore, the '853 Patent specifically contemplates embodiments which include an additional feature, e.g., a locking lip, protruding from the superior surface of the lower body that minimizes the potential for dislocating the expansion member. The specification states that "the bottom floor of channel 86 employ a locking lip 88 to ensure that the expansion plate 82 is properly installed and to minimize the potential for dislocating expansion plate 82a." Appx77, col. 9, ll. 37-40; Appx60-61, Figs. 6b-6d. See also, Appx77-78, col.

10, ll. 33-35; col. 12, ll. 38-41; Appx67-68, Figs. 12b-12e: Appx72, Figs. 16a-16b. Thus, the backout must be minimized by providing a feature on the superior surface of the lower body that inhibits the expansion member from sliding all the way back out of the implant, not solely by other features of implant which may be used to prevent dislocation such as screw threads within a threaded bore.

Accordingly, Larsen fails to teach or suggest that "a portion of the superior surface of the lower body is configured to inhibit backout of the expansion member from the intervertebral implant," and therefore does not anticipate claim 1 of the '853 Patent. Globus did not establish that no jury could reasonable conclude that Larsen did not anticipate claim 1 or 2 of the '853 Patent.

### 2. Claim 1 is Not Anticipated by U.S. Patent No. 6,443,989 (Jackson)

Jackson does not anticipate claim 1 because it fails to teach or suggest each feature required by the claim. First, Jackson does not disclose an upper and lower body, but rather a single piece. Appx4800-4801.

In addition, like Larsen, Jackson fails to teach or suggest the limitation "wherein a portion of the superior surface of the lower body is configured to inhibit backout of the expansion member from the intervertebral implant," as recited in claim 1 of the '853 Patent.

The embodiment of Jackson relied upon by Globus shows a screw which goes through the side of the cage. Jackson does not disclose anything in a lower body

which inhibits backout. Appx4801.

Globus did not establish that no jury could reasonable conclude that Jackson did not render obvious claim 1 or 2 of the ‘853 Patent.

### 3. Claim 1 is Not Rendered Obvious by U.S. Patent 5,522,899 (Michelson)

Like Larsen and Jackson, Michelson lacks an element on the superior surface of the lower body to inhibit backout. Globus admits as much. Appx4607. Michelson discusses burrs on the screw, which is not part of the lower body, to inhibit backout. One inventive step of the ‘853 patent is to add an element to the lower body to inhibit backout in case the screw fails. Appx4802-4803. Globus offers no art to combine an element of backout inhibition on the lower body with the screw burrs described in Michelson. Globus identifies no recognized need to place an element of backout inhibition on the lower body. Globus identifies no motivation to place an element of backout inhibition on the lower body. Globus offers only a hindsight observation that adding a tab or notch to the lower body would be easy. Globus Brief p. 43.

Globus did not establish that no jury could reasonable conclude that Michelson did not render obvious claim 1 or 2 of the ‘853 Patent.

### C. Claims 1 and 2 of the '714 Patent are Not Anticipated nor Rendered Obvious

#### 1. Claims 1 and 2 of the '714 Patent are Not Anticipated nor Rendered Obvious by U.S. Patent 6,176,882 (Biedermann)

Biedermann does not anticipate claim 1 because it fails to teach or suggest each feature required by the claim. Biedermann does not disclose: (1) "increasing the separation distance between the upper body and the lower body allows articulation or increased articulation of the intervertebral implant," and (2) three distinct entities that represent the "insert," "expansion member," and "set screw" that are required by claim 1 of the '714 Patent.

Biedermann fails to disclose or suggest the following limitation recited in claim 1 of the '714 Patent:

> wherein the intervertebral implant is configured such that increasing the separation distance between the upper body and the lower body allows articulation or increased articulation of the intervertebral implant.

The District Court adopted the parties agreed construction of "articulation" as meaning "rotational motion or increased rotational motion about at least one axis between the upper and lower bodies." Appx859. Globus has taken the position that the articulation must occur ***after expansion***. Appx2100, ¶ 81 (articulation requires "rotation or movement about at least one axis between the upper and lower bodies ***after expansion*** as required by the claims.").

The term “articulation” is used in the ‘714 Patent with regard to flexion (bending) and extension (straightening). For example, “as the artificial implant is flexed and extended, the convex superior surface of the expandable joint insert articulates with a concave inferior surface of the upper body.” Appx178, col. 5, ll. 40-43. Moreover, Globus’s expert, Dr. Peloza, agrees that “[a] personal of ordinary skill in the art would understand articulation as construed (and as described in the patent) to mean movement akin to a “ball and socket” joint that would permit rotation of the implant between the upper and lower bodies.” Appx2100, ¶ 82. Therefore, the context for the term “articulation” requires the ability to undergo rotational movement or increased rotational movement about at least one axis between the upper and lower bodies when in its expanded configuration ***after*** it has been inserted and expanded in the human spine.

As shown in Figs. 9 and 10 reproduced below, Biedermann discloses an embodiment of an expandable interbody implant which is inserted from the posterior direction and where some extended angle is to be produced between the upper and lower engagement members (60, 61) of the implant ***during*** expansion. A pre-expanded configuration is depicted in Fig. 9 and an expanded configuration is depicted in Fig. 10.




PRE-EXPANDED EXPANDED

Appx5070

As Dr. Oxland explained, the upper and lower engagement members have had their relative angles changed during expansion due to a turnbuckle arrangement that has different thread pitches on the different portions of the spindle (18', 19'). Appx5073, col. 5, ll. 38-43. When the spindle is turned, the different thread pitches cause one wedge member (45) to move a greater distance than the opposing wedge member (46), and thus a tilting of the upper engagement member with respect to the lower engagement member. Appx5073, col. 5, ll. 41-50. However, once expanded, the upper and lower engagement members in Fig. 10 are held rigidly in their final position due to the wedge members being held in place on the spindle. There is no relative rotation about an axis between the upper and lower bodies in this expanded configuration, and thus there is no "articulation." Accordingly, Biedermann does not disclose "that increasing the separation distance between the upper body and the

lower body allows articulation or increased articulation of the intervertebral implant" as required by claim 1, and therefore does not anticipate claim 1 of the '714 Patent.

Biedermann also fails to teach the following limitation of claim 1 relating to a set screw:

> a set screw configured to be rotated to advance the expansion member to engage the insert such that the insert increases a separation distance between the upper body and the lower body after insertion of the intervertebral implant in the human spine.

Globus identifies the "insert" of claim 1 as being the pair of wedge members (45, 46) from Biedermann and the "expansion member" as being the threaded spindle (15) that is in contact with the wedge members. Globus then identifies the "set screw" as the bearing members (25, 26) that are received on the ends of the spindle in Biedermann. However, the bearing members are not screws, but actually drive nuts. Dr. Peloza maintains that a drive nut is not a set screw. Appx4637. As Globus's expert, Dr. Peloza, alleges with respect to literal infringement of this limitation, a drive nut is not a set screw. Appx2099-2100, ¶ 75. And as Globus and Dr. Peloza reiterated a number of times at trial, pushing (as with a set screw) is not the same as pulling (as with a drive nut). Appx4494, Appx4568. Because a drive nut is not a set screw, Biedermann does not anticipate this limitation of claim 1 of the '714 Patent.

With respect to claim 2 of the '714 Patent, which is dependent on claim 1 of the '714 Patent, Biedermann does not anticipate each required element of claim 1 of the '714 Patent and therefore is not invalidating prior art.

Globus did not establish that no jury could reasonably conclude that Biedermann did not anticipate or render obvious claim 1 or 2 of the '714 Patent.

### 2. Claims 1 and 2 of the '714 Patent are Not Anticipated by Larsen

Larsen was considered by the Patent and Trademark Office in the course of the prosecution of the '714. Appx4804. Larsen does not contain both a set screw and an expansion member. Appx4804-4805. Contrary to the testimony referenced by Globus, the screw in Larsen is not separate from the expansion member.

In addition, Larsen does not disclose articulation. Appx4805-4806. Again, Globus points to testimony by Dr. Peloza which added graphics not in the original patent figures in order to claim an element which does not exists. Appx4806.

With respect to claim 2 of the '714 Patent, which is dependent on claim 1 of the '714 Patent, Larsen does not anticipate each required element of claim 1 of the '714 Patent and therefore is not invalidating prior art.

Globus did not establish that no jury could reasonably conclude that Larsen did not anticipate claim 1 or 2 of the '714 Patent.

## IV. The District Court's Summary Judgment of Non-Infringement of Claim 17 of the '810 Patent Should Be Reversed Because It Defies Fundamental Mathematical and Scientific Principles

All motion is relative to a specified frame of reference. The fundamental error of the District Court was ignoring the frame of reference specified by the claim. While the District Court quoted the correct frame of reference, i.e. "the surfaces of the upper and lower bodies," it ignored this and substituted some other frame of reference in its analysis.

The District Court granted summary judgment of non-infringement of claim 17 of the '810 Patent because it found that Flexuspine did not present evidence establishing a genuine dispute of material fact that "the expansion member's movement must be oblique (in a slanting or sloping direction) to the surfaces of the upper and lower bodies." Appx2921, adopted by Appx3527. The basis for the District Court's holding was set forth in footnote 3 of the Report and Recommendation of the United States Magistrate Judge, which states "Flexuspine offers no evidence of oblique movement *of the expansion member* for the record" or "that the expansion member [moves] other than [in a] substantially linear manner." Appx2921. This finding is clearly erroneous in light of the claim language, the Parties' agreed construction of oblique, the specification, the evidence of infringement in the record proffered by Flexuspine, the explicit findings of the

District Court itself, basic geometry, and the fundamental physics' principle of relative motion.

Flexuspine has met its burden of demonstrating that the Accused Products do, in fact, infringe through mathematically and scientifically supported evidence and expert testimony that demonstrates a genuine issue of material fact as to whether the expansion member is advanced "in a substantially linear direction" and "at least partially oblique to" portions of both the inferior surface of the upper body and a portion of the superior surface of the lower body. Considering that all reasonable inferences from undisputed facts must be drawn in favor of the nonmoving party, and the disputed evidence must be viewed in the light most favorable to the nonmoving party, the District Court committed clear error in finding that no reasonable juror could find infringement based on Flexuspine's evidence. *See Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1359 (Fed. Cir. 2006). When properly considered, Flexuspine's evidence demonstrates that it was entitled to survive summary judgment.

### A. The Agreed Construction of Oblique Movement

The element at issue in claim 17 of the '810 Patent is as follows:

> an expansion member comprising an elongated body having a substantially flat inferior surface, a substantially flat superior surface, and a first angled portion at an insertion end of the elongated body, wherein the expansion member is configured to be positioned between the upper body and the lower body *such that applying a force to a trailing end of the elongated body opposite the insertion end of the*

*elongated body is configured to advance the first angled portion and the substantially flat superior and inferior surfaces of the expansion member* ***in a substantially linear direction <u>between</u>*** *and* ***at least partially oblique <u>to</u>*** *at least a portion of the inferior surface of the upper body and at least a portion of the superior surface of the lower body* after insertion of the upper and lower body in the spine to increase a separation distance between the superior surface of the upper body and the inferior surface of the lower body.

Appx153. '810 Patent at 36:13-29.

During claim construction, the Parties disputed the italicized limitation of this element, focusing on the "substantially linear" and "at least partial oblique" movement of the expansion member. This dispute was eventually resolved by agreement that no construction was necessary for this limitation, which was adopted by the District Court. Appx859. However, in order to facilitate this resolution, the Parties further agreed that the type of "oblique" movement entailed the following:

1. The expansion member's movement must be oblique (in a slanting or sloping direction) **<u>to</u>** the surfaces of the upper and lower bodies; and
2. Both the "first angled portion" and flat surfaces of the expansion member must move obliquely **<u>with respect to</u>** the same portion of the surface of the upper and lower bodies.

Appx1809 (emphasis added).

When this agreement as to the meaning of "oblique" movement is applied to the claim language, the element of the claim at issue requires the following components be met:

1. The expansion member is located between the upper and lower bodies of the implant;

2. A force is applied to the trailing end of the expansion member;
3. The first angled portion and the substantially flat portion of the expansion member are "advanced in a ***substantially linearly*** direction ***<u>between</u>***" a portion of the inferior surface of the upper body and a portion of superior surface of the lower body;
4. The advancement is "at least ***partially oblique <u>to</u>***" (at least partially in a slanting or sloping direction to) those same portions of the upper and lower bodies; and
5. This advancement results in an increase in the separation distance between the superior surface of the upper body and the inferior surface of the lower body.

The Parties do not dispute that the Accused Products meet components 1, 2, 3, or 5. There is no dispute that the force input to the implant causes the expansion member to advance in the specified manner – *i.e.*, the force applied to expansion member of the implant causes first angled portion and the substantially flat portion of the expansion member to be advanced "substantially linearly between" the portions of inferior surface of the upper body and the superior surface of the lower body. Appx982, n.2; Appx1810. There is also no dispute as to the effect of this advancement on the implant – *i.e.*, the advancement of the expansion member results in an increase in the separation distance of the upper and lower bodies. However, for component 4, the Parties disagree as to whether the movement of the expansion member within the implant can be characterized as being "at least partially oblique to" the identified surface portions of the upper and lower bodies.

### B. Oblique Movement within the Specification of the ‘810 Patent

The language of claim 17 and the specification of the ‘810 Patent contemplate that the expansion member must move ***substantially linearly*** **<u>between</u>** the upper and lower bodies, and there must also be an ***oblique movement*** of the first angled and substantially flat portions of the expansion member **<u>relative</u>** **<u>to</u>** portions of the upper and lower bodies.

Flexuspine’s expert, Dr. Thomas Oxland, detailed how the movement of the portions of the expansion member are oblique relative to both a portion of both the inferior surface of the upper body and a portion of the superior surface of the lower body. *See* Appx1885-1886 at ¶ 125; *see* Appx1811-1812; Appx2470. This oblique movement is caused by the obliquely angled surfaces of the expansion member, which act as ramps upon which the upper and lower bodies are driven as the expansion member moves past. This opinion is supported by Dr. Oxland’s analysis of the specification of the ‘810 Patent and the movement of the components of the Caliber.

Dr. Oxland discussed the embodiments disclosed in the specification, including the Figure 9F, which depicts the linear and partially oblique movement:




Diagram 1

Appx2029-2030 at ¶ 205

Dr. Oxland explained as follows:

> … linear advancement of the expansion member results in a sloped movement of the expansion member to both the upper and lower bodies. This oblique movement is achieved as a result of the angled surface of the expansion member riding along a corresponding angled surface of the insert as it is advanced, which also causes the expansion member to be moved vertically with respect to both upper and lower bodies.

Appx2029. Dr. Oxland then illustrated this oblique movement with reference to another diagram, which has been reproduced below.




Diagram 2
Appx2029-2030 at ¶ 205

The diagram below depicts the oblique movement relative to points on the inferior surface of the upper body and the superior surface of the lower body.




Diagram 3

In the embodiment shown in Fig. 9F, because the upper and lower bodies are held in place in the horizontal direction by the outer cage or frame of the implant, the upper and lower bodies can only move vertically <u>relative to each other</u>. However, that is irrelevant. The claim describes the motion between the bodies and the expansion member, not the bodies relative to each other. If reference points are selected on a portion of the surface of the expansion member and the upper or lower bodies, relative motion occurs between the reference point on the expansion member

and the reference points on the upper or lower bodies in an oblique direction. This concept – relative motion – is explained in more detail below.

### C. The District Court's Rationale in Declining to Credit Flexuspine's Expert Testimony Regarding Relative Motion Defies the Laws of Physics and Mathematics

The District Court declined to accept Dr. Oxland's testimony regarding movement relative to a point of reference, finding instead that no reasonable juror could accept this testimony as sufficient to prove infringement. This finding is in direct contradiction to the fundamental physics principle of relative motion and geometry.

There is no such thing as absolute motion. The motion of any object can only be described relative to something else – other objects, observers, or a specified coordinate system. The viewpoint from which movement is observed is called a frame of reference. *See, e.g., Cytologix Corp. v. Ventana Med. Sys.,* 2006 U.S. Dist. LEXIS 40973, at *4-6 (D. Mass. June 20, 2006) (discussing the concept of relative movement between two objects from a frame of reference); *Konami Corp. v. Roxor Games, Inc. et al.*, 445 F. Supp. 3d 725, 735, n.10 (E.D. Tex. 2006) (recognizing the ordinary and accustomed meaning of "relative movement"). Claim 17 is clear that the oblique motion of the expansion member must be determined relative to points on the surface of the upper and lower bodies. The parties expressly acknowledged that the reference frames were the surface of the upper and lower bodies. Appx1809.

Consider an observer that stands on top of the superior surface of the lower body in Diagram 2 above, and looks at a fixed point on the expansion member. This observer represents the reference frame specified in the claim. As the expansion member is advanced, the fixed point on the expansion member will be moving horizontally across the observer's face and vertically up from the observer (i.e., the vertical separation between the expansion member and the lower body is increasing). In accordance with the principle of relative motion, the observer correctly concludes that the point is moving at an **angle *upward* and *to the right*** relative to him as the expansion member is advanced. It will not be seen to move merely up (vertically) **or** merely to the right (horizontally). It will be seen to move up **and** to the right at the same time - in other words, at an angle relative to the observer on the lower body. This is precisely of how an angle is defined in geometry. If you move one unit to the right and one unit up at the same time, the resulting trajectory is a 45º angle relative to a coordinate system fixed at the starting point. Therefore, as Dr. Oxland opined, the expansion member moves at an oblique angle **relative to the lower body**.

The District Court's finding that motion of an object that is created by simultaneous movement in both vertical and horizontal directions is not really at an 'angle,' but rather just along a "slanted hypotenuse," is self-contradictory and plainly ignores one of the most basic principles of geometry. The slanted hypotenuse is not a mere geometric fantasy; it is the very definition of an angle. Saying that something

moves along a ‘slanted hypotenuse’ is identical to saying it is moving along an oblique angle relative to some reference frame. The slanted hypotenuse is the actual trajectory (*i.e.*, path of motion) that a point on the expansion member follows relative to an observer standing on the superior surface of the lower body. The mere fact that any motion along an angle (*i.e.*, a ‘slanted hypotenuse’) can be broken down into horizontal and vertical components does not make it any less a motion at an angle. Any object that is moving simultaneously in both vertical and horizontal directions in some frame of reference is by mathematical definition also moving at an angle in that frame of reference. And clearly, the expansion member is moving simultaneously both vertically and horizontally with respect to the lower body.

As an example, a person climbing a flight of stairs is indeed traveling along a path that would be the hypotenuse of a triangle. This angled path has both vertical and horizontal components of motion (*e.g.*, one foot forward and one foot step up), but it is equally true to say that he is moving at a 45º angle relative to the floor. Run and rise defines an angle, and an angle defines a run and rise. They are completely identical descriptions of the same underlying geometry.

Nor does it matter if it is possible to identify other frames of reference where the expansion member is moving only “horizontally” and the lower body is moving only “vertically.” In fact, it may be possible to specify some arbitrary reference

frame in which neither component is moving at all. That is irrelevant. The claim specifies the reference frames to be used: the upper and lower bodies.

The District Court's conclusion that the movement created is a "slanted hypotenuse" resulting from the (in its description) horizontal movement of the expansion member and the vertical movement of the upper body proves that their relative motion is at an angle, rather than the opposite. That should be dispositive of this question.

**D. Oblique Movement within the Accused Products**

The oblique relative movement contemplated by the '810 Patent is precisely how the Accused Products operate. The upper and lower bodies of the accused products have ramps. Driving the expansion member forward against the ramps forces the position of the expansion member relative to the bodies to change both horizontally and vertically, just as driving a wheelchair up a ramp changes the horizontal and vertical position of the user relative to the starting point on the ground. It is completely obvious that an observer standing on the ground would say the wheelchair is moving at angle relative to him. In exactly the same way, an observer on the lower body would correctly conclude the expansion member is moving at an angle relative to him.

Globus convinced the District Court to put a black box over the inner workings of the Caliber implants to ignore the role of the inclined ramps in the relative movement of the components. But when Dr. Oxland analyzed the relative movements of these components of the Caliber, he found, and opined, that as the expansion member of the Caliber is advanced, the inclined ramps cause the expansion member to move obliquely relative to the flat portions of both the upper and lower bodies. Dr. Oxland provided his opinion that:

> The elongated body (actuator) of the Caliber and Caliber-L is advanced in a substantially linear direction between the upper and lower bodies. The elongated body slides along the internal ramps of both the upper and lower bodies. This causes the first angled portion and superior and inferior surfaces of the elongated body to move in an oblique direction to both of the upper and lower bodies along at least a portion of its path of travel.

Appx1885-1886 at ¶ 125.

This oblique movement of the elongated body relative to the upper and lower bodies within the Accused Products, the Caliber and Caliber-L implants, is shown by Dr. Oxland in the following diagrams:




Diagram 4—Caliber
Appx1885-1886 at ¶ 125




Diagram 5—Caliber L
Appx1885-1886 at ¶ 125

When asked at his deposition to identify which portions of the inferior surface of the upper body and the superior surface of the lower body the expansion member moved oblique to, Dr. Oxland identified those portions on the diagram from his report as shown below. These identified portions constitute points of reference, which are located on the "same" part of the superior and inferior surfaces of the upper and lower bodies in accordance with the Parties' agreement.




Diagram 6
Appx1791; *see also* Appx1886

Dr. Oxland explained in his deposition as follows:

> Q. … So the claim requires applying a force to a trailing end of the elongated body opposite the insertion end of the elongated body and it's configured to advance the first angled portion and the substantially flat superior inferior surfaces of the expansion member in a substantially linear direction between in and at least partially oblique to at least a portion of the inferior surface of the upper body and at least a portion of the superior surfaces. And I'm just looking to identify -- for you to identify for me the surfaces of the upper body and lower body that you're relying on.
>
> **A. … let's say on the lower body, if you look at the flat section of the superior surface and if you put a <u>coordinate system</u> on there, you would see that the linear actuator moves linearly and partially obliquely with respect to that portion. And similarly, if you would look at the inferior surface of the upper body, you would see that the linear actuator moves – or the actuator moved linearly and partially obliquely with respect to that.**
>
> …
>
> Q. And so is your testimony that the first angled portion and the substantially flat superior, inferior surfaces of the expansion member move obliquely or at least partially obliquely to that portion of the -- those portions of the inferior and superior surfaces of the bodies?

**A. Yes.**

Appx1210 (171:15-173:8) (emphasis added).

The following diagram more clearly depicts this relative oblique movement that occurs between the points of reference on the expansion member and the lower body. Appx1811. Although not shown, there would also be the same type of relative oblique movement between the points of reference on the expansion member and the upper body.




EXPANDED

Diagram 7
Appx1811

This oblique movement is not merely a hypothetical "hypotenuse" of the horizontal movement of the expansion member and the vertical movement of the upper and/or lower bodies as the magistrate judge states. Appx2921. Rather, as Dr. Oxland opines, the expansion member of the Caliber actually moves along this path at an oblique angle **relative** to a portion of the upper body and a portion of the lower body as it is substantially linearly advanced between the bodies and slides along the inclined ramps, just as was contemplated by the patentees in Appx102 at Fig. 9F; Appx109 at Fig. 17.

Moreover, it is completely obvious that the expansion member slides along the inclined ramp, which is obviously at an angle. It is physically impossible for this to occur without the expansion member moving at an angle relative to something.

The District Court is also incorrect in the statement that the oblique movement is only shown for one, but not both, of the first angled portion or the substantially flat portion of the expansion member. Appx2921. While the diagram above only depicts the oblique movement of the substantially flat portion of the inferior surface of the expansion member with respect to the point of reference on the superior surface of the lower body identified by Dr. Oxland, this was shown only as an example of the type of movement that occurs. Likewise, the mirror image of this oblique movement would also occur between the first angled portion and the substantially flat portion of the superior surface of the expansion member relative to

the point of reference on the inferior surface of the upper body identified by Dr. Oxland. Appx1210 (172:2-16).

A further annotated version of the same diagram was submitted on the record that depicts the oblique movement that would be experienced by both of the identified portions with respect to the point of reference on the portion of the superior surface of the lower body. The coordinate system for the point of reference was been added to illustrate how the movement is oblique relative to this point of reference.




Diagram 8
Appx3057

Flexuspine has proffered sufficient evidence to demonstrate a genuine issue of material fact that the movement of the expansion member is "substantially linear" between the bodies and that portions of the expansion member move "at least partially oblique" relative to the portions of both the inferior surface of the upper

body and a portion of the superior surface of the lower body for infringement of this limitation of claim 17 of the ‘810 Patent. Appx153.

## V. The Court Erred In Excluding References To The Synthes Litigation

### A. Legal Standard

The most reliable license may very well arise out of litigation. R*esQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 872 (Fed.Cir.2010). This Court has recently repeated its view that litigation related agreements may be admissible in a later patent suit involving the value of the patented technology. *Prism Techs. LLC v. Sprint Spectrum L.P.*, No. 2016-1456, 2017 WL 877221, at *5. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77–78 (Fed. Cir. 2012); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872–73 (Fed. Cir. 2010); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1572 (Fed. Cir. 1988); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983). “A “party may use the royalty rate from sufficiently comparable licenses.’” *Prism Techs. LLC v. Sprint Spectrum L.P.*, No. 2016-1456, 2017 WL 877221, at *6 (quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). *See also Ericsson v. D-Link Systems, Inc.*, 773 F.3d at 1227 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316–18 (Fed. Cir. 2011); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211–12 (Fed. Cir. 2010); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1318–22 (Fed. Cir. 2010).

Comparable does not mean identical. "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics,* 694 F.3d at 79. However, we have never required identity of circumstances; on the contrary, we have long acknowledged that "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1325 (Fed. Cir. 2009) (quoting *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 517 (Fed. Cir. 1995)). Thus, we have cautioned that "District Courts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies *other* than the patent in suit," *ResQNet,* 594 F.3d at 869, and "must account for differences in the **technologies and economic circumstances** of the contracting parties," *Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1211 (Fed.Cir.2010). *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (emphasis added).

**B. Synthes Litigation**

DePuy-Synthes Products, LLC sued Globus Medical, Inc. for patent infringement ("the Synthes litigation") by three Globus implant products, which are comparable to the Globus Caliber accused by Flexuspine. *Globus Medical, Inc. v. DePuy Synthes Products v. Globus Medical Inc.*, U.S. District Court for the District of Delaware, C.A. No. 11-652-LPS. On June 14, 2014, a jury awarded a royalty of

15% on past infringement (Appx1651, Appx2896, Appx3223-3224), and on March 25, 2014, the trial court awarded an ongoing royalty of 18%. Appx1668, Appx2896, Appx3223-3224). In a subsequent suit by Globus against Synthes, Globus took the position that the Synthes litigation was the benchmark for determining a reasonable royalty for spinal fusion implant patents. Appx3247.

The best test of comparability is vigorous cross-examination. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d at 1330-31. While Globus may argue that there are differences between the **technologies and economic circumstances** in Synthes and Flexuspine, "[t]he jury was entitled to hear the expert testimony and decide for itself what to accept or reject." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d at 831.

In his original report determining a reasonable royalty rate, Dr. Stephen Becker relied upon a settlement license agreement arising out of the Synthes litigation. Appx1421, Appx2896. The magistrate judge granted Globus's motion to strike Dr. Becker's reliance on this license agreement but allowed Dr. Becker to amend his report. Appx2903. In his amended report, Dr. Becker relies upon the actual jury verdict and judgment rendered in the Synthes case. Appx3223, Amended Becker Report ¶¶ 132-146, 218, 226-38. Dr. Becker did so because the infringing Globus products in the Synthes litigation are similar to the Globus infringing products in the instant case. Furthermore, the jury in the Synthes case was tasked with performing a hypothetical royalty negotiation dated approximately one month

from the date of the hypothetical negotiation in the instant case. The magistrate judge granted Globus's motion to strike Dr. Becker's reliance on the Synthes verdict. Appx3504-3510. The District Court overruled Flexuspine objection. Appx3526. At trial, Flexuspine made an offer of proof and renewed its request. Appx4414-4416, Appx5085-5119.

### C. Globus Statements To FDA Establish Comparability

Globus's own statements establish that the Globus products in the Synthes and Flexuspine cases are comparable. Flexuspine has accused the Caliber of infringing its patents. Globus represented to the FDA that the Caliber was "substantially equivalent" to the products in the Synthes litigation. Appx3213. A 510(k) allows a manufacturer of a medical device to avoid expense and delay of getting FDA approval by asserting the new device and previously approved devices are substantially equivalent. In its filing to get FDA approval of the Caliber, Globus providing charts of extensive comparison between the Caliber and Patriot group, which was the predicate to the Caliber. Appx3252-3254. The Patriot group includes InterContinental which one of the three products in the Synthes litigation. Appx3270. The other two products also consist of a static spacer similar to the Patriot. Appx3224-3225.

In its 510(k) filing, Globus stated that "The performance of the CALIBER spacers meets the predetermined functional and design criteria, and are substantially

equivalent to the characteristics of the currently cleared PATRIOT Spacers." Appx3256. Globus goes on to detail its testing of the products to conclude that:

> ***CALIBER Spacers have been demonstrated to be substantially equivalent to the predicate implants in indications and design.*** Performance was evaluated in accordance with the "Guidance for Industry and FDA Staff, Class II Special Controls Guidance Document: Intervertebral Fusion Device," June 12, 2007. ***CALIBER Spacers have been found to meet the criteria set forth in the guidance document in terms of indications, design, and performance.***

Appx3252 (emphasis added).

Then, after providing the FDA with detailed comparisons on a variety of aspects of the two devices such as the size, dimensions, surgical approaches, materials, and performance, Globus concludes again that the products are "substantial equivalents" based on their use, operation, and performance:

| | |
|---|---|
| **Substantial Equivalence** | The subject CALIBER™ Spacers are substantially equivalent to the predicate PATRIOT® Lumbar Spacers (K072970 & K093242) based on the following criteria:<br>• Has the same indicated use,<br>• Uses the same operating principle,<br>• Incorporates previously cleared implant technology,<br>• Incorporates the same materials,<br>• Has equivalent mechanical performance, and<br>• Uses the same packaging materials and processes. |

Appx3254. Based on Globus's urging that the static spacers the subject of the Synthes Verdict such as the Patriot are "substantial equivalents" to the Caliber, the FDA approved the Caliber for sale in the United States, putting it in the same classification as the products at issue in the Synthes Verdict. Globus products

involved in the Synthes litigation – Coalition, and Intercontinental (i.e. the Patriot) and the Independence – have the same FDA classification as the Caliber and Altera: 21 CFR §888.3080, applicable to intervertebral body fusion devices. Appx3273, Appx3276, Appx3278.

Similarly, the U.S. Patent and Trademark Office also classifies the patents in this litigation and those the subject of the Synthes Verdict in similar, comparable fashion. The patents in the Synthes case are all classified within the U.S. Classification 623/17.11 or 623/17.16. Flexuspine's patents are also both classified with 623/17.16 or 623/17.15. Below is the U.S.P.T.O. description of these classifications:

> CLASS 623, PROSTHESIS (I.E., ARTIFICIAL BODY MEMBERS), PARTS THEREOF, OR AIDS AND ACCESSORIES THEREFOR;
>
> 11.11 IMPLANTABLE PROSTHESIS:
>
> 16.11 … Bone:
>
> 17.11 … Spinebone (subject matter wherein the artificial vertebra or part thereof includes a cushioning spacer means adapted to replace or assist a natural intervertebral disc between adjacent vertebrae).
>
> 17.16 ... Having spinal disc spacer between adjacent spine bones.

Appx3515. In other words, the USPTO considers all of the products claimed in these patents to be similar technology.

Considering that: (1) Globus argued to the FDA that the static spacer portion of the products at issue in the Synthes litigation and those here are substantially equivalent; (2) the FDA agreed and gave all products at issue the same FDA classification; (3) the patents asserted in the Synthes and Flexuspine litigation share the same classification; and (4) Dr. Oxland has provided further support for the products' comparability, the Synthes Verdict is highly relevant to the royalty analysis of the Caliber. If all these combined factors do not suffice, then nothing short of a license to the exact same products or the exact same patents could be considered as a "comparable license" data point for the jury to consider. There is not support in the case law for that radical position.

### D. The Synthes Verdict Is A Comparable Royalty Rate

The Synthes verdict was neither a litigation settlement nor a cross license resolving multiple patents and lawsuits. Rather, it was an objective determination of the same issue asked of every jury in a patent case: Assuming that Synthes' patents are valid and infringed, what reasonable royalty would the parties have negotiated.

In addition, the Synthes Verdict was not remote in time to the hypothetical negotiation in this case. Rather, the jury in *Synthes* was asked to assume a hypothetical negotiation date of December 2010 (Appx3223), while the Flexuspine jury assumed a hypothetical negotiation date of January 2011. Appx3225. In other

words, there is only a one-month difference between the jury verdict in Synthes and the Flexuspine hypothetical negotiation.

### E. Becker's Analysis of the Synthes Royalty Rate

Dr. Becker, consulting with Dr. Oxland, determined that the patents, products, and royalty license reflected in the Synthes Verdict are very much comparable to the patents and products in Flexuspine case. Dr. Becker "reviewed the fact and circumstances" of the *Synthes* case and "considered comparability both from a technical standpoint and from an economic standpoint" to see if the "Synthes verdict and judgment would be a relevant data point in the determination of the reasonable royalty in this matter." Appx3224, ¶ 139-140.

Dr. Becker "discussed the three patents asserted by Synthes against Globus with Dr. Oxland" who informed him that "the three patents were related to the Globus Independence, Coalition and Intercontinental products," "that these patents all relate to intervertebral implants of the type that would be used in an intervertebral fusion procedure," that the patented technology relates to "features of intervertebral implants that would be used in the same types of products and surgical procedures as the patents-in-suit and the accused Globus products in this case." Appx3224-3225. ¶141-142. Dr. Becker also relied upon Globus's own representations that the "idea behind all three patents [asserted in the Synthes litigation] was to prevent the bone screws that attach spinal implants to the patient's vertebrae from backing out—

threatening nearby blood vessels— by ensuring a rigid connection between the screws and the implant itself," which, Dr. Becker noted, was a key feature in one of the asserted Flexuspine patents. Id.

Dr. Becker considered the technological differences between the non-expandable implants in the Synthes case and the expandable implants here, and found them sufficiently similar to warrant an economic comparison. Appx3228, ¶ 226. Dr. Becker noted that Globus admits the comparability by heavily relying on static spacers as part of its defense. To minimize the technological advancement of the patents, "Globus's technical expert, Dr. Peloza, opined in this case that 'the presence of expandable fusion cages does not render obsolete static spacers, which consistently have been proven effective in fusion procedures. In fact, Globus continues to sell static spacers alongside expandable spacers.'" Appx3225, ¶142. To minimize the damages, "Globus's damages expert, Daniel Jackson, considered Globus's static spacers to be sufficiently comparable that they represented acceptable non-infringing alternatives to the asserted Flexuspine patents." *Id.*

Dr. Becker considered "the market conditions and other economic factors affecting the negotiations would be nearly identical, given the small one-month difference between the two dates," and that "Globus was in the same position" in both negotiations as the licenses of a "a one-way, non-exclusive U.S. license." Appx3225, ¶¶ 143-44.

Dr. Becker accounted for the "important economic difference between the Synthes-Globus negotiation (and hence the jury verdict) and the Flexuspine-Globus negotiation is with respect to the competitive relationship between the parties," which required a downward adjustment. Appx3225, ¶ 145. Dr. Becker noted that the 15% royalty awarded in the Synthes Verdict required a "significant" downward adjustment because the "competitive relationship between Globus and Synthes had been a significant factor" in determining the rate, which was not present here. Appx3230, ¶ 236. In isolation, the Synthes verdict would imply a royalty rate of 12%, but when considered with all the available data, including other existing, key licenses, Dr. Becker concluded the reasonable royalty would be 10%. Appx3230-3231, ¶¶ 236-37.

## CONCLUSION

For the foregoing reasons, Flexuspine respectfully requests that the Court affirm the District Court's decision regarding the jury verdict. Flexuspine further requests that the Court reverse District Court's summary judgment of noninfringement of the '810 and exclusion of reference to the Synthes litigation and remand the case to the District Court for trial of Flexuspine' s claims for infringement of the '810 Patent.

Dated: March 22, 2017.

Respectfully submitted,

*/s/ Mark D. Strachan*

Mark D. Strachan
State Bar No. 19351500
Darren P. Nicholson
State Bar No. 24032789
SAYLES | WERBNER, P.C.
1201 Elm Street, Suite 4400
Dallas, Texas 75270
(214) 939-8700 – Telephone
(214) 939-8787 – Facsimile
mstrachan@swtriallaw.com
dnicholson@swtriallaw.com

Jonathan T. Suder
State Bar No. 19463350
Todd I. Blumenfeld
State Bar No. 24067518
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
(817) 334-0400 - Telephone
(817) 334-0401 - Facsimile
jts@fsclaw.com
blumenfeld@fsclaw.com

ATTORNEYS FOR PLAINTIFF-CROSS-APPELLANT FLEXUSPINE, INC.

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25 and Fed. Cir. R. 25, I certify that I have this day filed and served the foregoing document upon all counsel of record via the court's CM/ECF system.

Dated: March 24, 2017 /s/ *Mark D. Strachan*

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff/Cross-Appellant Flexuspine, Inc. certifies that:

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations in Rule 28.1(b)(2). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b), this brief contains 12,214 words (including footnotes). This certificate was prepared in reliance on the word count of the word-processing system (Word 2013) used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirement of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Times New Roman font.

The undersigned further certifies that this brief complies with the confidentiality requirement of Federal Rule of Appellate Procedure 28(d) in contains no words (including numbers) marked as confidential.

Dated: March 22, 2017 /s/ *Mark D. Strachan*